

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-15-00176-CR

CODY WAYNE BEDFORD A/K/A                             APPELLANT
CODY BEDFORD

V.

THE STATE OF TEXAS                                      STATE

----------

### FROM THE 355TH DISTRICT COURT OF HOOD COUNTY
### TRIAL COURT NO. CR12844

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Cody Wayne Bedford of the offense of evading arrest or detention while using a vehicle in flight. *See* Tex. Penal Code Ann. § 38.04(b)(2)(A) (West Supp. 2016).[2] The jury also found that Appellant used or

---

[1]*See* Tex. R. App. P. 47.4.

[2]In 2011, the Legislature enacted three separate bills revising article 38.04 without coordinating the various bills into one coherent numbering scheme. *See*

exhibited a deadly weapon, the vehicle, during the commission of the offense. After finding that Appellant had previously been convicted of two felony offenses, the jury assessed his punishment at thirty-seven years' confinement. In one point, Appellant contends the evidence is legally insufficient to support the finding that he used or exhibited a deadly weapon. We affirm.

**Evidence**

Around 1:30 or 1:45 a.m. on June 18, 2014, Junior Stewart was letting his dogs out when he heard tapping on his front door. When Stewart opened his front door, he saw his daughter, scared and shaking, standing there, so he let her in; he also saw Appellant sitting in a silver minivan in the driveway. Stewart called 911, told the dispatcher there was a prowler, and identified Appellant as the prowler.

After Stewart hung up the phone, Appellant began beating on the front door. Appellant then went back to his minivan, honked his horn four or five times, and started screaming and yelling for Stewart's daughter. Stewart, after seeing Appellant back up his minivan as if he was going to drive through the front door, called 911 again. When Appellant drove his minivan through Stewart's front yard, Stewart called 911 a third time. While driving through Stewart's yard,

---

*Adetomiwa v. State*, 421 S.W.3d 922, 924–27 (Tex. App.—Fort Worth 2014, no pet.). The State here relied on the bill that made evading arrest or detention while using a vehicle a third degree felony. *See* Act of May 27, 2011, 82nd Leg., R.S., ch. 920, § 3, 2011 Tex. Sess. Law Serv. 2320, 2321 (West) (codified at Tex. Penal Code § 38.04(b)(2)(A)).

Appellant "splintered" Stewart's mailbox stand. When a police officer arrived, Appellant drove off.

After the police officer arrived, Stewart told him that Appellant had just left, identified Appellant, and gave a description of Appellant's minivan. Meanwhile, Officer Michael Holly, who was on his way to Stewart's, saw Appellant driving the silver minivan. Aware that Appellant had warrants out for his arrest, Officer Holly followed Appellant across town but waited for other officers before attempting to stop him.

After Appellant reached a residential area, he accelerated quickly to get away. At this point, Officer Holly turned on his siren and flashers indicating Appellant needed to stop, but Appellant failed to stop and, instead, continued down several streets to Acton Highway. By this time Officers Damon Hice and Bryan Wood had joined Officer Holly in the chase.[3]

Officer Holly testified that a lot of the chase occurred through a residential area and at very high rates of speed. In the residential areas, Officer Holly estimated Appellant's speed at forty-five to fifty miles per hour. At one point, it reached about eighty-five miles per hour. Officer Holly testified Appellant ran about eight stop signs along the route. Once on Acton Highway, which was described as a two-lane road with no shoulders and a double-yellow stripe down

---

[3]Regarding the officers' decision to give chase, please see: http://www.usatoday.com/story/news/2015/07/30/police-pursuits-fatal-injuries/30187827/

3

the center, Appellant drove on the wrong side of the road while going through a curve. Officer Holly described Appellant's driving as "very dangerous" and capable of causing death or serious bodily injury. Officer Wood had worked motor vehicle collisions before, and he said there was no doubt Appellant's car was capable of causing death or serious bodily injury. After exiting highway 377, there were no other vehicles on the road except Appellant's and the pursuing officers'.

The chase ended in a cul-de-sac in a residential area. After Appellant drove into the cul-de-sac, he tried to make a U-turn, but he could not make a sufficiently tight turn, so he put his car in reverse and rammed the driver's-side door of Officer Hice's patrol vehicle. All of the airbags in Officer Hice's vehicle deployed, and his vehicle shut down. Officer Hice described the impact as "pretty violent" and explained how it was painful when Appellant's vehicle hit his and pushed him into the gun rack in the center console. Officer Holly then pulled in front of Appellant to block him in. Appellant leaped out of his vehicle and fled on foot with other officers in pursuit on foot.

The State introduced three video recordings from the three officers' cars. State's Exhibit 1 was the recording from Officer Wood's car. State's Exhibit 2 was from Officer Holly's car. And State's Exhibit 3 was the video from Officer Hice's vehicle.

Officer Holly's video shows the chase started in a city residential neighborhood. Officers Wood's, Holly's, and Hice's videos show the chase

4

ended in a rural residential neighborhood. Officer Wood's and Holly's videos show traffic before the chase starts but no traffic after the chase starts. Officer Hice's video shows traffic as he attempts to join the chase but not after he encounters Appellant's minivan.

The videos show the three police officers following Appellant at a high rate of speed without successfully shortening the distance between them and Appellant, show Appellant running stop signs, and show Appellant driving on the wrong side of the road. As noted above, except for the three police officers, there were no other motorists while the chase was taking place. However, at one point during the chase, Officer Hice, who was attempting to join the chase, was in position to intercept Appellant at an intersection.

Officer Holly's video, taken while he was following Appellant, shows Appellant running a stop sign and turning right in front of Officer Hice's police car, which was coming from Appellant's left; Officer Hice appears to slow down or brake to allow Appellant to access the road safely. Officer Hice's video shows his car coming to that same intersection, and his police car appears to slow down, allowing Appellant, who had just run the stop sign on Officer Hice's right, onto the road without risking a collision.

Officer Hice's video shows that once in the cul-de-sac, Appellant appeared to attempt to make a U-turn but his minivan lacked a tight enough radius to successfully make the turn. Officer Hice's police car drove in behind Appellant's minivan, effectively impeding Appellant's ability to back up and pull out.

5

Appellant backed up his minivan anyway and struck Officer Hice's police car. Officer Holly pulled in front of Appellant, blocking Appellant in the cul-de-sac. Appellant exited his minivan and ran away on foot.

## Complaint

In one point, Appellant contends the evidence is insufficient to support the finding that he used or exhibited a deadly weapon. Appellant asserts that there was no evidence his car weaved or fishtailed out of control. His car never left the road or the road's surface. He denied driving on the wrong side of a divided highway because he denied driving down any road with a dividing line. To the extent he drove over the middle portion of the roadway, Appellant asserts that the officers did as well and did so safely. Appellant denied striking any objects on the roadway or adjacent to it. Appellant denied cutting off any other drivers or forcing them to take evasive action to avoid a collision. Appellant denied imperiling any other drivers because there were no other drivers on the roadway during the chase. Appellant contends the only contact between vehicles occurred when he accidentally touched Officer Hice's vehicle, which had pulled in behind him, while he was trying to back up. Appellant stresses that no one was seriously hurt. Appellant denies that anyone was ever at risk of death or serious bodily injury.

## Standard of Review

The test for determining whether the evidence is sufficient to support a criminal conviction is whether any rational trier of fact could have found the

6

essential elements of the crime beyond a reasonable doubt after viewing the evidence in a light most favorable to the prosecution. *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005). A deadly weapon is "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(A) (West Supp 2016). A deadly weapon is also "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B). To hold evidence sufficient to sustain a deadly weapon finding, the evidence must show that (1) the object meets the statutory definition of a deadly weapon, (2) the deadly weapon was used or exhibited during the events from which the felony conviction was obtained, and (3) other people were put in actual danger of death or serious bodily injury. *See Drichas*, 175 S.W.3d at 798; *see also Brister v. State*, 449 S.W.3d 490, 494 (Tex. Crim. App. 2014) (quoting *Sierra v. State*, 280 S.W.3d 250, 256–57 (Tex. Crim. App. 2009), for proposition that vehicle must pose an actual danger of death or serious bodily injury).[4]

Objects that are not usually considered dangerous weapons may become so, depending on the manner in which they are used during the commission of an offense. *See Drichas*, 175 S.W.3d at 798. A motor vehicle "is not a deadly

---

[4]Our review shows the quote the court in *Brister* relied upon is not from *Sierra* but is actually from a subsequent case that cited *Sierra* for that proposition. *See Roppolo v. State*, No. 13-11-00437-CR, 2012 WL 3598736, at *2 (Tex. App.—Corpus Christi Aug. 22, 2012, pet. ref'd) (mem. op, not designated for publication) (citing *Sierra*, 280 S.W.3d at 256–57).

weapon per se." *Brister*, 449 S.W.3d at 494. A motor vehicle may become a deadly weapon if the manner of its use is capable of causing death or serious bodily injury. *Id.*; *Drichas*, 175 S.W.3d at 798. Specific intent to use a motor vehicle as a deadly weapon is not required. *Drichas*, 175 S.W.3d at 798. The danger posed to motorists must be actual and not simply hypothetical. *Id.* at 799. Pursuing officers or other motorists need not be in a zone of danger or take evasive action. *Id.* A defendant is not required to intentionally strike another vehicle. *Id.* "The volume of traffic on the road is relevant only if no traffic exists." *Id.* "Capability is evaluated based on the circumstances that existed at the time of the offense." *Id.* Section 38.04(b)(2)(A) of the penal code makes using a vehicle an element of the offense, and section 1.07(a)(17)(B) of the penal code makes it possible for the vehicle to be a deadly weapon. Tex. Penal Code Ann. §§ 1.07(a)(17)(B), 38.04(b)(2)(A). "The statute specifically pertains to motor vehicles, so a deadly weapon finding is appropriate on a sufficient showing of actual danger, such as evidence that another motorist was on the highway at the same time and place as the defendant when the defendant drove in a dangerous manner." *Drichas*, 175 S.W.3d at 799. "An automobile can be a deadly weapon if it is driven so as to endanger lives." *Cates v. State*, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003).

## Discussion

In *Drichas*, the defendant drove at speeds of fifty to seventy miles per hour, causing his truck to fishtail on turns. *Drichas*, 175 S.W.3d at 797. The

8

defendant also disregarded traffic signs and signals, drove erratically, wove between lanes and within lanes, and drove on the wrong side of the highway. *Id.* He turned abruptly into a construction zone, knocking down barricades as he did so. *Id.* There was evidence of "some" traffic on the road during the chase. *Id.* The chase ended when the defendant turned into a mobile-home park and abandoned his still moving truck to flee on foot, which allowed the truck to roll into a parked van, which, in turn, hit a mobile home. *Id.* at 797–98.

Appellant initiated the high-speed chase in a residential neighborhood and ended the high-speed chase in another residential neighborhood. The absence of other traffic was not a product of Appellant's driving in remote, unpopulated areas—because the chase occurred in populated areas at its start and end—but was apparently a product of the chase occurring in the middle of the night and, perhaps more importantly, fortuitous luck, as the videos show other cars before the chase. Officer Hice's video even showed a pedestrian getting something out of his car, which was parked on the street, before Officer Hice successfully joined the chase. The absence of people—of children—in the residential neighborhoods would appear to be attributable to the time of day that the chase occurred. "The volume of traffic on the road is relevant only if no traffic exists." *Id.* at 799.

Nevertheless, the evidence showed that the manner in which Appellant drove his vehicle placed the officers, particularly Officer Hice, in actual danger of death or serious bodily injury. *See id.* at 798 ("Appellant's manner of using . . .

9

his truck posed a danger to pursuing officers and other motorists that was more than simply hypothetical; the danger was real, . . . particularly where appellant drove on the wrong side of the highway."); *Duckett v. State*, No. 06-14-00060-CR, 2015 WL 996188, at \*3 (Tex. App.—Texarkana Mar. 3, 2015, pet. ref'd) (mem. op., not designated for publication) ("[The defendant] put the pursuing law enforcement officers in actual danger."); *Roppolo*, 2012 WL 3598736, at \*2 ("The evidence shows appellant actually endangered others as he led the police on a high-speed chase. As Sergeant Lopes followed appellant . . . , appellant drove to a parking-lot exit and 'came to a very fast stop,' forcing Sergeant Lopez to make an evasive maneuver with his police car."); *Moore v. State*, No. 06-10-00173-CR, 2011 WL 3274840, at \*3 (Tex. App.—Texarkana Aug. 2, 2011, no pet.) (mem. op., not designated for publication) ("[P]olice officers should not be excluded from the class of persons capable of being endangered by the driver of a fleeing vehicle."); *Drichas*, 219 S.W.3d 471, 476 n.5 (Tex. App.—Texarkana 2007, pet. ref'd) (same).

Viewing the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that the manner in which Appellant drove his car during the offense placed others in actual danger of death or serious bodily injury. *See Drichas*, 175 S.W.3d at 798. We overrule Appellant's sole point.

## Conclusion

Having overruled Appellant's sole point, we affirm the trial court's judgment.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and SUDDERTH, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  September 22, 2016